IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| NORMAN D. ROBINSON,<br><br>　　　　　Plaintiff,<br><br><br>　vs.<br><br><br>ZIONS SECURITIES CORPORATION,<br>　　　　　Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:09-CV-122-TC |

Former private security officer Norman D. Robinson, who suffers from bilateral neuropathy, alleges age and disability discrimination under Title VII as well as retaliation in violation of the Fair Labor Standards Act (FLSA) and state public policy. Defendant Zions Securities Corporation (ZSC), Mr. Robinson's former employer, moves for summary judgment on all of Mr. Robinson's remaining claims.[1]

According to ZSC, Mr. Robinson has not established a prima facie case of retaliation because he has no evidence that his supervisors knew of his protected activity (i.e., providing information to the United States Department of Labor (DOL) in an investigation of ZSC) at the relevant times. ZSC also contends that Mr. Robinson cannot establish that he was a qualified individual with a disability under the Americans with Disabilities Act (ADA) or that he was

---

[1]On April 26, 2010, the parties stipulated to dismissal of Counts II and IV of the Complaint. (See Stipulation of Dismissal (Docket No. 25).) The remaining causes of action (Counts I, III, V, and VI) are the subject of ZSC's motions for summary judgment.

discharged from his job in violation of the Age Discrimination in Employment Act (ADEA).

Because the court finds that Mr. Robinson has provided evidence sufficient to create genuine issues of material fact concerning his retaliation and disability claims, ZSC's request for summary judgment on those claims is DENIED. But the court finds that ZSC is entitled to summary judgment on Mr. Robinson's age discrimination claim, because the record lacks evidence to support even a prima facie case. Accordingly, ZSC's request for summary judgment on that claim is GRANTED.

## INTRODUCTION

Mr. Robinson alleges that, after he participated in the DOL investigation as a witness, ZSC intentionally retaliated against him under the FLSA by (1) imposing a physical job requirement that did not exist until after he participated in the DOL investigation; (2) downgrading his work assignment; and (3) terminating him from his position as a patrol officer. He also alleges, based on the same facts, that ZSC violated state law by retaliating against him in contravention of public policy.

Mr. Robinson contends that ZSC violated the ADA when ZSC terminated him from his job based on ZSC's misperception that he was disabled.[2] And he alleges that ZSC violated the ADEA because it discharged him based on his age.

## FACTUAL BACKGROUND

Defendant Zions Securities Corporation (ZSC) manages properties in Salt Lake City. ZSC employs on-site patrol officers to provide security services for those properties, including

---

[2]Mr. Robinson has apparently abandoned his other ADA claim that he is actually disabled under the Act. (See Pl.'s Mem. Opp'n Third Mot. Summ. J. at 5.)

patrolling of various buildings and parking structures.

In May 1989, ZSC hired Mr. Robinson. During his tenure at ZSC, Mr. Robinson held a variety of security officer positions. From approximately 2003 through June 2008 (a short time before his employment with ZSC ended), Mr. Robinson held the position of Customer Support Services (CSS) Patrol Officer. Jeffrey Shaw (a ZSC Senior Manager) and Bret Sayer (CSS Assistant Supervisor) directly supervised Mr. Robinson.

**Mr. Robinson's Bilateral Neuropathy**

Mr. Robinson suffers from bilateral neuropathy. His malady was diagnosed in 2007, but Mr. Robinson did not tell ZSC of the diagnosis. His bilateral neuropathy limits his ability to run.

**Patrol Officer Duties**

CSS Patrol Officers' overall responsibilities are to protect the safety and property of the tenants and customers of the various properties managed by ZSC. In defense of its decision to remove Mr. Robinson from the CSS Patrol Officer position, ZSC contends that its patrol officers must be able to run and that such an ability is an essential function of the position. According to ZSC, to be effective, a Patrol Officer must exhibit the ability to give chase, i.e., to run after someone, if necessary. Mr. Robinson disputes ZSC's characterization of the job's essential requirements, as discussed below in the section titled "Functional Capacity Evaluation and Job Description."

**DOL Investigation**

In February 2008, the Wage and Hour Division of the United States Department of Labor (DOL), under FLSA, began investigating reports that ZSC was requiring its CSS patrol officers to work through lunch without compensation. Mr. Robinson participated as a witness in the

investigation before the events leading up to his June 2008 discharge.  As a result of its investigation, the DOL required ZSC to pay back wages to patrol officers, including Mr. Robinson.

According to the record, Mr. Shaw, Mr. Sayer, Jeff Vanek (ZSC's Director of Compliance & Employee Services), Kent Gibson (a ZSC Vice President), and Kimberly Baker (ZSC's Human Resources Administrator)[3] became aware of the DOL investigation when it began.  And Ms. Baker was "heavily involved" in complying with the investigation conducted by the DOL.  (Baker Dep. at 17-18.)  Ms. Baker "prepared the documents for the Department of Labor, got everything together that they requested, prepared the checks, delivered the settlement notices prepared by the Department of Labor over to each individual involved, and pretty much took care of almost everything."  (Id. at 18.)  But whether the appropriate decisionmakers specifically knew about Mr. Robinson's participation at the relevant times is a genuine issue of material fact, as noted below.

**New Patrol Officer Assignments in April 2008**

In early 2008, ZSC was advised that the ZCMI Center Mall, one of the properties for which ZSC provided security, would be demolished.  This required changes to the patrol officers' assignments and schedules.  In April 2008, ZSC management met with ZSC's security department and Mr. Gibson presented schedule changes for patrol officers.

---

[3]In the memorandum supporting ZSC's motion concerning Mr. Robinson's FLSA claim, ZSC admits, for purposes of the summary judgment motion only, that Mr. Shaw, Mr. Sayer, Ms. Baker, and Mr. Vanek all had decision-making authority relating to Mr. Robinson's employment with ZSC.  In ZSC's Reply Memorandum, however, ZSC backs away from that statement by saying that Mr. Robinson admitted that only Mr. Shaw and Mr. Vanek had decision-making authority.

Between April 9 and 20, 2008, ZSC told Mr. Robinson that the shift schedules were being changed and that he would be able to bid on the shifts according to seniority. Mr. Robinson was the most senior CSS Patrol Officer at the time. But the schedules, when they were released, did not give preference to seniority.

"[W]hen the schedule came out, [the patrol officers'] names were already plugged in." (Robinson Dep. at 114.) Mr. Robinson's new assignment was to patrol various downtown ZSC properties on foot on Tuesdays through Saturdays. Although Mr. Robinson did not complain about his new assignment, he "did not like" it. (Id. at 120; see also Shaw Aff. ¶ 19.) He believed that he should "qualify for a Saturday off" and that ZSC should "take into consideration" the "department seniority" to allow him to "select the assignment that [he] wanted." (Robinson Dep. at 120.) He desired either the food court or vehicle patrol assignment and to have a Monday through Friday schedule.

**April and May 2008**

At some point in April 2008, Mr. Robinson's supervisor noticed that Mr. Robinson's ability to walk had visibly deteriorated. Mr. Shaw and Mr. Vanek met with Mr. Robinson to discuss what Mr. Shaw described as Mr. Robinson's "struggle to walk the properties assigned to him due to the new schedule and tasks . . . ." (J. Shaw handwritten notes at ZSC00151, attached as Ex. 6 to Pl.'s Mem. Opp'n Mot. Summ. J. re: FLSA Claim.)

During this meeting, Mr. Shaw and Mr. Vanek expressed concern that Mr. Robinson was not able to perform all essential functions of the patrol officer position – and "that as outlined in the job description, [they] felt [Mr. Robinson] could not run if required." (Robinson Dep. at 133; see also Vanek Aff. ¶ 9; Shaw Aff. ¶ 24.) Mr. Shaw told Mr. Robinson to undergo a functional

capacity evaluation (FCE). Ms. Baker contacted a physical therapist to conduct the FCE.

**Functional Capacity Evaluation and Job Description**

On June 16, 2008, Mr. Sayer sent copies of a job description for Mr. Robinson's CSS Patrol Officer position to the provider and discussed what Mr. Sayer described as the job duties for the position, including the requirement that a CSS Patrol Officer "run 1.5 miles in 15 minutes per Deputy Sheriff's entry evaluations) factor for hire. Stairs 10 flights in 10 minutes is our estimate." (Pl.'s Ex. 1, Ex. 6 to Mem. Opp'n Mot. Summ. J. re: FLSA Claim.) The job description was not dated. The asserted requirements to run 1.5 miles in 15 minutes and climb 10 flights of stairs in 10 minutes do not appear in any earlier job description of the CSS Patrol Officer position. Of the CSS Patrol Officers, only Mr. Robinson was tested to determine if he could run 1.5 miles in 10 minutes. (Shaw Dep. at 15.)

ZSC claims that the ability to run is an essential function of the CSS Patrol Officer position and always has been. But contrary evidence supports Mr. Robinson's position that the ability to run was a newly imposed requirement defined specifically for Mr. Robinson's functional capacity evaluation and designed to eliminate Mr. Robinson in his position as CSS Patrol Officer.

No other security officer was given a functional capacity evaluation to determine whether he or she had the ability to run. ZSC did not know whether any other security officer had the ability to run, much less the ability to run as defined in the job description given to the physical therapist who evaluated Mr. Robinson.

Mr. Robinson testified that he did not receive a description of his position that required an ability to run until May 2008, right before he was removed from his security officer position.

And he further testified that the only job description of a Security Patrol Officer that he received before May 2008 was a January 1999 job description which does not include a requirement that the officer have the ability to run. (See Jan. 1999 Job Description, attached as Ex. 6 to Pl.'s Opp'n to Mot. Summ. J. re: ADA Claim.) Indeed, Mr. Robinson testified that ZSC specifically told the patrol officers to avoid running because they were not first responders to an emergency.

In June 2008, ZSC received a copy of the FCE. (See June 19, 2008 Functional Capacity Evaluation, attached as Ex. I to Def.'s Mem. Supp. Mot. Summ. J. (Docket No. 23).) In the FCE, the physical therapist noted that Mr. Robinson "was unable to run, but did participate in a fast walking task for four hundred feet in two minutes." (Id. at 3 (noting that Mr. Robinson's inability to run did not match the job description provided to the physical therapist).)

Ms. Baker, Mr. Vanek and Mr. Shaw met to review the assessment. They discussed what they perceived as Mr. Robinson's inability to perform the "essential functions" of the CSS Patrol Officer position because of Mr. Robinson's inability to run. Ms. Baker testified that, "[b]ased on what we heard from the assessment people, we decided that that wasn't the best position for him any longer." (Baker Dep. at 7.)

**Decisionmakers' Knowledge of Mr. Robinson's Protected Activity**

Mr. Shaw, Mr. Sayer, Ms. Baker, Mr. Vanek, and Mr. Gibson have submitted affidavits in which they swear to the following:

> 3. In February of 2008, the Department of Labor ("DOL") began an investigation of ZSC under the Fair Labor Standards Act for employees working through lunch on occasion.

4.      I was aware of the investigation at the time.[4]

5.      I did not know which of ZSC's employees participated in the investigation [in any way].[5]

6.      Prior to the filing of this lawsuit in February 2009, I was unaware whether Robinson participated in the DOL investigation in any way, including as a witness.

7.      As a result of this lawsuit,[6] I have become aware that Robinson has alleged that he participated as a witness in the DOL investigation.

8.      I have no knowledge whether Robinson actually participated in any capacity in the DOL investigation, including as a witness.

9.      Furthermore, I have no knowledge of what Robinson said to the DOL [about ZSC][7] in his alleged role as a witness in the DOL investigation.

10.     None of the decisions in which I was involved were in retaliation for Robinson's participation in any investigation conducted by the DOL, nor could they have been given that I was unaware of his participation in the DOL investigation.[8]

(Affs. of Jeffrey Shaw, Jeffery Vanek, Bret Sayer, Kimberly Baker, and Kent Gibson, attached as

exhibits to Def.'s Mem. Supp. Mot. Summ. J. on FLSA claim.)

Although the above sworn statements are evidence that the participating employees had

---

[4]Kimberly Baker's affidavit also includes the following phrase, "but I was not aware of who participated in the investigation."

[5]The Jeffrey Shaw, Bret Sayer, and Kent Gibson affidavits contain this additional language.

[6]Jeffery Vanek, Bret Sayer, and Kimberly Baker use the language "During the course of this lawsuit" rather than "As a result of this lawsuit."

[7]Jeffery Vanek's affidavit contained this additional language.  But Ms. Baker's affidavit does not contain any of paragraph 9.

[8]Neither Kimberly Baker's nor Bret Sayer's affidavit includes this paragraph.

no knowledge of Mr. Robinson's protected activity (particularly because the court may not judge witness credibility in the summary judgment context[9]), Mr. Robinson has presented enough circumstantial evidence to create a factual dispute about knowledge (particularly because the court must make all reasonable inferences in the non-movant's favor).

For example, he points out that Ms. Baker testified that she was "heavily involved" in complying with the investigation conducted by the DOL. (Baker Dep. at 17-18.) In addition, Ms. Baker's testimony concerning how information was provided to the DOL conflicts with the testimony of Bret Sayer, who was ZSC's Assistant Supervisor to the Customer Support Services Department at the time of Mr. Robinson was removed from his patrol officer position.[10] (See Sayer Dep. at 5.) Ms. Baker testified that, although she knew the DOL sent out questionnaires to employees, she understood that the questionnaires were sent out by mail by the DOL based on a list of employees that Ms. Baker provided to the DOL and that the employees returned completed questionnaires directly to the DOL. (Baker Dep. at 18-19.) But Mr. Sayer testified that he received the DOL questionnaire from Ms. Baker and returned the completed questionnaire to Ms. Baker. (Sayer Dep. at 30, 32-33.) Mr. Sayer further testified that, in that questionnaire, he provided factual information concerning the opportunity of employees to take lunches. (Id. at

_____

[9]Yet ZSC essentially asks the court to judge the credibility of the affiants and find that a sworn denial trumps circumstantial evidence. For example, ZSC says Mr. Robinson "does not dispute that Mr. Vanek and Mr. Shaw unequivocally testified in their affidavits that they were unaware of Robinson's involvement in the [DOL] investigation. These facts alone justify granting ZSC's Motion for Summary Judgment." (Def.'s Reply Mem. in Supp. of Mot. Summ. J. (Docket No. 15) at ii.)

[10]ZSC contends that the evidence does not conflict and that Mr. Robinson is mistaken. (See Def.'s Reply Mem. (Docket No. 15) at iv n.2.) But ZSC's attempt to clarify the purported conflict was not effective, particularly because ZSC does not cite to evidence in the record to support its assertions.

32-33.)

And although Mr. Shaw states in his Affidavit that he was unaware before the filing of this civil action that Mr. Robinson participated in the DOL investigation, the facts support a reasonable inference to the contrary. In particular, Mr. Shaw acknowledged in his Affidavit that, as early as February 2008, he was aware that the DOL began an investigation of ZSC in connection with employees working through lunch. (Shaw Aff. ¶¶ 3-4.) And during his deposition, Mr. Shaw testified that he was aware that the investigation concerned CSS Patrol Officers (the position occupied by Mr. Robinson). (Shaw Dep. at 19-20.) At that time, ZSC employed approximately ten to twelve CSS Patrol Officers. (Sayer Dep. at 6.) Lastly, Mr. Shaw was aware, around March 2008, that the DOL required ZSC to pay back wages to the CSS Patrol Officers as a result of its investigation. (Shaw Dep. at 28.)

Later, after Mr. Robinson had been removed from his security patrol officer position, Ms. Baker prepared and distributed the back wages checks to ZSC employees, including Mr. Robinson. At that point, when Ms. Baker gave him the back wages check, he asked her why the amount on the check was different (apparently less) "than what we were originally informed?" (Robinson Dep. at 97.) According to Mr. Robinson, Ms. Baker responded, "'I have no idea. [The DOL] told us what we'd pay each of you individuals. I guess they just didn't believe what you told them'" about "'the amount of hours that you had worked'" during lunch breaks. (Id. at 97-98.)

**Removal of Mr. Robinson from Patrol Officer Position**

On June 20, 2008, ZSC removed Mr. Robinson from his position as CSS Patrol Officer. The decision was made by Mr. Shaw and Mr. Vanek, with input from Ms. Baker. Ms. Baker

participated in the process by reviewing and discussing Mr. Robinson's physical abilities and the essential functions of his security patrol officer position. Mr. Gibson approved the decision.

At that time, ZSC offered Mr. Robinson the options of (1) taking one of three part-time lower-paying positions (one of which was a temporary shuttle driver position) that did not offer benefits; (2) waiting until August 2008 to see whether a parking attendant position opened up; (3) collecting unemployment; or (4) retiring. Mr. Robinson took the temporary part-time shuttle driver job, but after that job ended on April 1, 2009, Mr. Robinson retired.[11]

## ANALYSIS

### Summary Judgment Standard

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Justice v. Crown Cork & Seal Co., Inc., 527 F.3d 1080, 1085 (10th Cir. 2008). "An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant." Jenkins v. Wood, 81 F.3d 988, 990 (10th Cir. 1996). When applying this standard, the court must construe all facts and reasonable inferences from those facts in a light most favorable to Mr. Robinson, the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008).

The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477

---

[11]The parties present information about jobs offered to Mr. Robinson later, but the court will not consider these facts because they occurred during settlement discussions.

U.S. 317, 324 (1986). But if the non-moving party comes forward with admissible evidence that a reasonable jury could find for the non-moving party on the issue, summary judgment is not appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Nevertheless, summary judgment should be granted if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence upon which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

**Retaliation Claims**

Mr. Robinson alleges parallel claims of unlawful retaliation under 29 U.S.C. § 215(a)(3) of the Fair Labor Standards Act (FLSA) and Utah law prohibiting adverse employment actions in violation of public policy. Specifically, Mr. Robinson alleges that ZSC unlawfully retaliated against him for participating as a witness in the DOL investigation by changing his job assignment, imposing a physical requirement that had not existed, and removing him from his job as a CSS Patrol Officer.[12]

---

[12]Mr. Robinson contends that even though ZSC offered him a lower-paying, part-time, temporary position as a shuttle driver, which he took and held for a short time (in June 2009 he retired), he was effectively discharged on June 20, 2008, when he was removed from his position as CSS Patrol Officer. Because the court, when analyzing summary judgment issues, must draw all reasonable inferences in favor of Mr. Robinson (the non-movant), the court adopts Mr. Robinson's characterization of his discharge. But no matter how it is characterized, evidence supports the inference that Mr. Robinson suffered an adverse employment action. See, e.g., Annett v. Univ. of Kan., 371 F.3d 1233, 1237-38 (10th Cir. 2004) ("An adverse employment action constitutes 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

FLSA Retaliation Claim

The FLSA provides in relevant part that, "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has . . . testified or is about to testify in any [FLSA] proceeding[.]"  29 U.S.C. § 215(a)(3).

To analyze FLSA retaliation claims, the Tenth Circuit applies the burden shifting analysis enunciated in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973): (1) the plaintiff must establish a prima facie case of retaliation; (2) then the employer must proffer a legitimate reason for the adverse employment action; and (3) if the employer does so, the plaintiff must show there is a genuine issue of material fact as to whether the employer's proffered reason is pretextual.  Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1394 (10th Cir. 1997).

To avoid summary dismissal of his FLSA claim, Mr. Robinson must first present evidence supporting a prima facie case of retaliation by showing that a reasonable jury could conclude that (1) he engaged in protected activity under FLSA; (2) he suffered an adverse employment action contemporaneous with or subsequent to the protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action.  Pacheco v. Whiting Farms, Inc., 365 F.3d 1199, 1206 (10th Cir. 2004).  The U.S. Supreme Court and the Tenth Circuit have emphasized that the burden of establishing a prima facie case is "slight," "relatively lax," and "not onerous."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005);  Annett v. Univ. of Kan., 371 F.3d 1233, 1241 (10th Cir. 2004); see also Jute v. Hamilton Sundstrand Corp., 420

significant change in benefits.'") (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 861 (1998)).

13

F.3d 166, 173 (2d Cir. 2005) (burden of establishing prima facie case at summary judgment stage is minimal). Furthermore, the burden "'is one of production, not persuasion; it can involve no credibility assessment.'" Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)).

ZSC contends that Mr. Robinson cannot establish the causation element of a prima facie case (i.e., he has failed to provide evidence that his supervisors knew of his protected activity at the time he was removed from his position as CSS Patrol Officer).

The decisionmaker must be aware of the employee's participation in the FLSA-related action. Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). No direct evidence exists to show a causal connection between Mr. Robinson's participation in the DOL investigation and the loss of his patrol officer job. But Mr. Robinson need not provide direct evidence that his employer had knowledge of his participation in the protected activity; rather, he need only offer circumstantial evidence that could reasonably support an inference that ZSC possessed such knowledge. See, e.g., Jones v. Bernanke, 557 F.3d 670, 679 (D.C. Cir. 2009) (stating that, to survive summary judgment, the employee "need not provide direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did"); Jute, 420 F.3d at 175 (stating that employer's knowledge may be inferred from circumstantial evidence); Goldsmith, 996 F.2d at 1163 (same).

Temporal proximity of events to the adverse employment action may be sufficient to establish causation. Pacheco, 365 F.3d at 1206 ("A causal connection can be demonstrated circumstantially through evidence that justifies an inference of retaliatory motive, such as a 'very

14

close' temporal proximity between the protected activity and adverse employment action."). The Tenth Circuit emphasizes that, although courts should not "unduly stretch the 'close temporal proximity'" period, courts should not interpret "close temporal proximity" "too restrictively where the pattern of retaliatory conduct begins soon after [the protected activity] and only culminates later in actual discharge." Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996); see also Jute, 420 F.3d at 176-77 (noting that "background evidence" of adverse employment actions can show chain of events leading to discharge and so establish temporal proximity).

And although the sequence of events alone is not sufficient to establish knowledge of an employee's participation in protected activity, close temporal proximity between the employee's participation and the adverse action is a factor from which a jury could infer that the employer possessed the requisite knowledge. See, e.g., Jute, 420 F.3d at 175 (concluding that the plaintiff's removal from a company team one day after being named as a witness provided compelling indirect evidence of knowledge of participation in protected activity). Here, the sequence of events immediately following Mr. Robinson's participation in the DOL investigation supports a conclusion that ZSC was aware of his participation and took action to terminate him from his employment.

First, Mr. Robinson presents evidence demonstrating ZSC's knowledge, despite ZSC's assertion that it was unaware of Mr. Robinson's participation as a witness in the DOL investigation into ZSC's failure to pay wages under the FLSA. Mr. Robinson testified that, when he asked Ms. Baker why the check he was receiving from ZSC for those unpaid wages from Ms. Baker were lower than he had first been informed, she responded, "I guess they just didn't

15

believe what you told them." This assertion, although made in 2009, suggests that Ms. Baker had knowledge of Mr. Robinson's participation as a witness in the DOL investigation and that she held a negative view of the same. And the other decisionmakers (including Mr. Shaw) were fully aware that the DOL was conducting an investigation into ZSC's alleged violations of the FLSA. That investigation involved the CSS Patrol Officers and resulted in payment of back wages to the CSS Patrol Officers for time for which they should have been paid.

Second, the time between the DOL investigation and the first in a series of adverse actions (i.e., the re-assignment of patrol locales and times) was less than two months. The re-assignment was closely followed by Mr. Robinson's supervisors' attention to his ability to walk, and their requirement that he undergo a functional capacity evaluation. After the FCE, Mr. Robinson was removed from his CSS Patrol Officer position and offered less attractive job options (or the option to collect unemployment or retirement).

The inference of knowledge and the temporal proximity of relevant events create a disputed issue of material fact regarding causation. Accordingly, despite ZSC's contention, Mr. Robinson has met his relatively light burden to establish a prima facie case of retaliation. (And because ZSC only targets Mr. Robinson's ability to establish a prima facie case, the court need not engage further in the McDonnell Douglas burden shifting analysis.)

<u>State Law Claim of Retaliation in Violation of Public Policy</u>

Mr. Robinson relies on the same set of facts to establish his state law claim of retaliation. As in the FLSA, Utah law requires Mr. Robinson to show, as one of the elements of his prima facie case of termination in violation of public policy, that "the discharge and the conduct bringing the [public] policy into play are causally connected." Ryan v. Dan's Food Stores, Inc.,

972 P.2d 395, 404 (Utah 1998). In its motion for summary judgment, ZSC focuses only the causation element of the state law claim.

For the same reasons that Mr. Robinson's FLSA claim survives summary judgment, the court finds that his state law claim survives summary judgment as well.

**Disability Discrimination Claim Under the ADA**

Norman Robinson alleges that ZSC unlawfully discriminated against him in violation of the Americans with Disabilities Act ("ADA"). As in a retaliation case, the Tenth Circuit uses the McDonnell Douglas burden-shifting analysis to assess a disability discrimination claim where, as here, there is no direct evidence of discriminatory intent to terminate Mr. Robinson from his position as a CSS Patrol Officer. Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008), cert. denied sub nom Coffey v. Sw. Bell Tel., L.P., 130 S. Ct. 69 (2009); MacKenzie v. City & County of Denver, 414 F.3d 1266, 1273 (10th Cir. 2005).

ZSC argues that Mr. Robinson cannot show that he is a "disabled person" as defined by the ADA. ZSC also asserts that, even if Mr. Robinson could show that he is disabled under the ADA, he cannot show that he is qualified, with or without accommodation, to perform the essential functions of the position of Security Patrol Officer.[13]

To establish his prima facie case under the ADA,[14] Mr. Robinson must show that (1) he is

---

[13] ZSC contends that the McDonnell Douglas burden-shifting analysis is unnecessary here because Mr. Robinson cannot and does not even make out a prima facie case of discrimination under the ADA.

[14] In 2008, Congress passed the ADA Amendments Act of 2008 that amended the ADA. However, these amendments did not take effect until January 9, 2009, and do not apply retroactively to actions that accrued before that date. See Hennagir v. Utah Dep't of Corrs., 587 F.3d 1255, 1261 n.2 (10th Cir. 2009) ("The ADA has been substantially amended via the ADA Amendments Act of 2008. It is unnecessary to consider the effect of those changes, given that

"disabled" under the ADA; (2) he is a "qualified" individual  (i.e., able to perform the essential functions of the job with or without reasonable accommodation); and (3) ZSC discriminated against him on the basis of his disability.  Hennagir v. Utah Dep't of Corrs., 587 F.3d 1255, 1261 (10th Cir. 2009) (citing Kellogg v. Energy Safety Servs. Inc., 544 F.3d 1121, 1124 (10th Cir. 2008)).  "[E]ach of these elements is essential to an ADA claim," and the failure to prove even one is fatal to the claim.  Hennagir, 587 F.3d at 1261-62.  ZSC contends that Mr. Robinson's ADA Claims fail because he fails to establish any of these elements.  See Johnson v. Weld County, Colo., 594 F.3d 1202, 1217-18 (10th Cir. 2010) (quoting MacKenzie, 414 F.3d at 1274).

Whether Mr. Robinson is "Disabled" under the ADA

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1) (emphasis added). Mr. Robinson is limiting the basis of his prima facie case to the claim that ZSC regarded or perceived him as disabled.  (See Pl.'s Mem. Opp'n Mot. Summ. J. (Docket No. 26) at 5.)

A person is perceived or regarded as disabled when "(1) a covered entity mistakenly believes that person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Justice v. Crown Cork & Seal Co., Inc., 527 F.3d 1080, 1086 (10th Cir. 2008) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471,

_____

[the plaintiff] was terminated in 2005.").  As in Hennagir, because the actions of which Mr. Robinson complains accrued before the 2008 ADA Amendments went into effect, those amendments do not apply here.

489 (1999)); see also 29 C.F.R. § 1630.2(*l*) (so stating).

The court finds that there is a triable issue of fact as to whether ZSC regarded Mr. Robinson as having an impairment that substantially limited his ability to perform the major life activity of walking. The phrase "major life activities" refers to those activities that are of central importance to daily life. In order for performing manual tasks to fit into this category, the tasks in question must be central to daily life." Toyota Motor Mfg. Kentucky, Inc. v. Williams, 534 U.S. 184, 185 (2002). Walking is a major life activity. 29 C.F.R. § 1630.2(i).

To be substantially limited in a specific major life activity, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. Toyota Motor Mfg., 534 U.S. at 185. Here, the record shows that Mr. Shaw and Mr. Sayer both believed that Mr. Robinson "struggled" while walking, that his ability to walk had "visibly deteriorated" to the point that they were concerned about his safety, that he could not even walk well enough to use a vehicle to assist him in his job, and that he could not walk up and down stairs in order to perform his job. In light of these declared perceptions by the key decisionmakers here, a jury could reasonably conclude that ZSC regarded Mr. Robinson as substantially limited in the major life activity of walking. See, e.g., EEOC v. Du Pont de Nemours & Co., 480 F.3d 724, 729 (5th Cir. 2007) (finding sufficient evidence that employer regarded employee as being unable to walk based on employer's stated belief that he appeared unable to walk at the plant).

Whether Mr. Robinson was a "Qualified Individual" under the ADA

"The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the

employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  The term

"essential function" is defined as "the fundamental job duties of the employment position the

individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1).  "Determining whether a

particular function is essential is a factual inquiry." Davidson v. America Online, Inc., 337 F.3d

1179, 1191 (10th Cir. 2002).  In conducting this inquiry, the finder of fact is required to consider

the employer's judgment regarding the functions of a job that are essential, including those

functions contained in a written job description.  See id.; see also 42 U.S.C. § 12111(8).

Under the Tenth Circuit's approach, to determine whether running is an essential job

function of the position of CSS Patrol Officer, the Court of Appeals would begin by deciding

whether ZSC "actually requires all employees in the particular position to satisfy the alleged

job-related requirement."  Hennagir, 587 F.3d at 1262 (quoting Davidson, 337 F.3d at 1191).

A reasonable jury could conclude that ZSC did not actually require all CSS Patrol

Officers to be able to run.  Indeed, the undisputed facts show that CSS Patrol Officers were not

tested to determine whether they were physically fit generally; to determine if they had the ability

to run; to determine how fast they could run; or to determine how far they could run. The record

also shows that ZSC did not know whether any CSS Patrol Officers other than Mr. Robinson

possessed the ability to run and no CSS Patrol Officer other than Mr. Robinson was given a

functional capacity evaluation to determine whether he possessed that ability.  In these

circumstances, the record permits a reasonable inference that ZSC did not require all CSS Patrol

Officers to possess the ability to run.  Consequently, there is a triable dispute of material fact as

to whether running was an essential requirement of the position of CSS Patrol Officer.

Even assuming for the sake of argument that ZSC in fact did require all Security Patrol

Officers to possess the ability to run, a reasonable jury could conclude that running is not

fundamental to the position. A jury would look at the following factors:

(i)    The employer's judgment as to which functions are essential;
(ii)   Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii)  The amount of time spent on the job performing the function;
(iv)   The consequences of not requiring the incumbent to perform the function;
(v)    The terms of a collective bargaining agreement;
(vi)   The work experience of past incumbents in the job; and/or
(vii)  The current work experience of incumbents in similar jobs.

Hennagir, 587 F.3d at 1262 (quoting 29 C.F.R. § 1630.2(n)(3) (citing Mason v. Avaya

Commc'ns, Inc., 357 F.3d 1114, 1119 (10th Cir. 2004)).

For example, a jury would be justified in concluding that ZSC never considered running

to be an essential function of the position, and, in fact, discouraged running. Also, a reasonable

jury could conclude that the written job description upon which ZSC now relies did not exist

until it was presented to Mr. Robinson just before his termination. And, over the course of Mr.

Robinson's 20-year career with ZSC from 1989 through 2008, he ran only once but otherwise did

not run while performing the duties of his position. Mr. Gibson told the CSS Patrol Officers that

it was not their job to be "first responders" to fires or other emergencies that required

intervention but, instead, to contact the appropriate authority. Finally, ZSC offers only

conjecture that a physical image somehow deters crime or makes patrons feel safe.

Because the record reflects a triable issue of fact as to whether Mr. Robinson is a

qualified individual under the first prong of the test (that he was able to perform the actual

essential functions of the position he held), there is no need to consider the second prong of the

test (i.e., whether, in the alternative, he could have performed the essential functions of the

position with a reasonable accommodation).  See, e.g., Davidson, 337 F.3d at 1192.

**Age Discrimination Claim**

To establish a prima facie case of age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., Mr. Robinson must show that "(1) he was within the protected age group;[15] (2) he was doing satisfactory work; (3) he was discharged despite the adequacy of his work; and (4) he was replaced by a younger person."  Marx v. Schnuck Markets, Inc., 76 F.3d 324, 327 (10th Cir. 1996).  Mr. Robinson has not produced evidence sufficient to establish a prima facie case (so the court need not proceed to the pretext portion of the analysis).

Specifically, the record before the court does not establish that Mr. Robinson was replaced by a younger person.  Mr. Robinson simply notes that he was the most senior patrol officer at ZSC, that comments about his appearance (presumably his apparent reduced athleticism) stereotyped him as old, that he was the only officer subject to a FCE, and that he was the only officer terminated.  That is not sufficient to send the claim to a jury.  Accordingly, ZSC is entitled to summary judgment on Mr. Robinson's age discrimination claim.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      ZSC's Motion for Summary Judgment on Robinson's FLSA Unlawful Retaliation Claim (Docket No. 9) is DENIED.

---

[15]Mr. Robinson was sixty-two years old when he was subjected to the FCE.  Although this fact is not presented in either party's statement of facts, it appears in Mr. Robinson's FCE. (See FCE at 2.)

2.      ZSC's Motion for Summary Judgment on Robinson's Termination in Violation of

Public Policy Claim (Docket No. 13) is DENIED.

3.      ZSC's third Motion for Summary Judgment (Docket No. 22) is DENIED IN

PART AND GRANTED IN PART.  That is, Mr. Robinson's age discrimination claim is

DISMISSED.  But his Title VII disability discrimination claim may go to the jury.

DATED this 12th day of July, 2010.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge